**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| A.A., *a minor, by his parents and next friends,* | * | |
| B.A., *in their own right and on behalf of their son,* | | |
| *A.A.*, and K.A., *in their own right and* | * | |
| *on behalf of their son, A.A.*, | | |
| | * | |
| *Plaintiffs,* | | |
| | * | |
| v. | | Civil Action No. RDB-25-167 |
| | * | |
| WILLIAM J. BARNES, *in his official* | | |
| *capacity as Superintendent of the Howard* | * | |
| *County Public Schools*, and HOWARD | | |
| COUNTY BOARD OF EDUCATION, | * | |
| | | |
| *Defendants.* | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>MEMORANDUM OPINION</u>**

This action arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* That law provides, in relevant part, that a State receiving federal education funding must provide children with qualifying disabilities a Free Appropriate Public Education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). A FAPE involves both "special education and related services," *id.* § 1401(3)(A), (9), which a school provides through an Individualized Education Plan ("IEP"). *See id.* § 1401(14). This case concerns "related services," which the IDEA defines to include "school nurse services designed to enable a child with a disability to receive a [FAPE] as described in the [I]ndividualized [E]ducation [P]rogram of the child." *Id.* § 1401(26)(A).

Plaintiffs, the minor, A.A., and his parents, B.A. and K.A., in their own right and on behalf of their son (collectively, "Plaintiffs"), brought this three-count Complaint for

1

Declaratory and Injunctive Relief against Defendants William J. Barnes, as Superintendent of the Howard County Public Schools ("HCPS"), and the Howard County Board of Education (collectively, "Defendants"). *See generally* (ECF No. 1). A.A. has been diagnosed with a series of conditions ranging from hydrocephalus and epilepsy to cerebral palsy. Beginning in October 2023, A.A. was enrolled as a student in the fourth grade at Pointers Run Elementary School ("Pointers Run"), a part of the Howard County Public Schools. HCPS determined that A.A. qualified to receive special education under the IDEA and began the statutory process of developing an Individualized Education Plan to provide him with a Free Appropriate Public Education.

Central to this case, A.A.'s parents requested that HCPS provide him with a Private Duty Nurse ("PDN"), a one-on-one nurse to be with him at all times during the school day and while traveling to and from Pointers Run. In January 2024, after multiple IEP meetings and related evaluations over the course of three months, HCPS determined that A.A. did not qualify for a Private Duty Nurse. The school denied his parents' request to provide him one as part of his IEP.

On February 27, 2024, Plaintiffs initiated a due process complaint with the Maryland Office of Administrative Hearings pursuant to the IDEA's administrative requirements. *See* 20 U.S.C. § 1415(f). In that hearing, they contended that HCPS had denied A.A. a FAPE by not providing him a Private Duty Nurse as part of his IEP. Administrative Law Judge ("ALJ") Daniel Andrews held a ten-day hearing, which took place on dates in June, July, and August of 2024, ending on August 22, 2024. On September 20, 2024, ALJ Andrews issued a decision

concluding that A.A. had not been denied a FAPE because he could safely attend school without a Private Duty Nurse.

Pursuant to 20 U.S.C § 1415(i)(2), Plaintiffs filed this three-count Complaint for Declaratory and Injunctive Relief on January 16, 2025. (ECF No. 1.) In essence, they challenge ALJ Andrews's decision. They ask this Court to find that A.A. was denied a Free Appropriate Public Education when the Howard County Public Schools determined that his Individualized Education Plan did not merit the provision of a PDN. (*Id.*)

Presently pending before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 15) and Defendants' Opposition and Cross-Motion for Summary Judgment (ECF No. 20). This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has reviewed the parties' submissions; no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth below, Plaintiffs' Motion for Summary Judgment (ECF No. 15) is DENIED and Defendants' Cross-Motion for Summary Judgment (ECF No. 20) is GRANTED.

## BACKGROUND

### I.    Statutory Background – The Individuals with Disabilities Education Act

Congress enacted the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, to ensure "that children with disabilities receive needed special education services." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 157 (2017). In return for federal funding, the IDEA requires that States[1] guarantee children with certain physical and intellectual disabilities a Free

---

[1] Maryland receives federal funding for education and so the IDEA applies to its public schools, including the Howard County Public Schools. Md. Code Ann., Educ. § 8-403.

Appropriate Public Education. 20 U.S.C. § 1412(a)(1)(A); *see Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 856 (4th Cir. 2023) (providing an overview of State responsibilities pursuant to the IDEA).

"For most children, a FAPE entails an education 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *G.M. by E.P. v. Barnes*, 114 F.4th 323, 329 (4th Cir. 2024) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017)). When general education suffices to provide a Free Appropriate Public Education, the IDEA is satisfied and no further action is necessary. *Id.* (quoting *Miller v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 64 F.4th 569, 575 (4th Cir. 2023)). When a child has a qualifying disability that makes a general education insufficient, the IDEA provides that child with "a substantive right" to have their school "work with [his] parents to furnish 'special education and related services' enabling [him] to receive a FAPE." *Fry*, 580 U.S. at 158 (first quote); *G.M.*, 114 F.4th at 329–30 (quoting § 1401(3)(A), 9, and citing *id.* §§ 1412, 1414) (second quote). "In addition to this substantive right, the IDEA guarantees certain procedural rights, including the rights of parents to . . . 'participate in meetings' regarding the identification, evaluation, and placement of their child." *Id.* at 330 (quoting 20 U.S.C. § 1415(b)).

The "'primary vehicle'" by which schools provide a Free Appropriate Public Education to an eligible child is by means of an Individualized Education Program ("IEP"). *Fry*, 580 at 158 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). An IEP is "a document that describes the child's unique needs and the [S]tate's plan for meeting those needs." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019). It is prepared by a child's "IEP Team," "a

4

group of school officials, teachers, and parents," and "spells out a personalized plan to meet all of the child's 'educational needs,'" including both special education services and any necessary related services like transportation, therapeutic, or nursing services. *Fry*, 580 U.S. at 158 (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)); 20 U.S.C. § 1401(26)(A) (defining "related services").

An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399 (quotation omitted). It must also aim to deliver a Free Appropriate Public Education in the "least restrictive environment." 20 U.S.C. § 1412(a)(5); Md. Code Reg. 13A.05.01.10. This means that, "[t]o the maximum extent appropriate, children with disabilities . . . [should be] educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). Though the IDEA requires a special education, a FAPE "is not synonymous with the best possible education." *G.M.*, 114 F.4th at 342 (internal quotations and citations omitted).

The IDEA envisions cooperation between parents and educators "to determine whether the child has a disability, whether that disability requires special education, and what any special education should look like." *Id.* at 330. When parents and educators disagree, the IDEA allows parents "to seek a 'due process hearing' in the appropriate administrative forum." *Id.* (quoting 20 U.S.C. §1415(f)). An impartial hearing officer—in this case, an Administrative Law Judge of the Maryland Office of Administrative Hearings—determines whether the child in question received a FAPE and, if necessary, orders relief. *See Sanchez v. Arlington Cnty. Sch. Bd.*, 58 F.4th 130, 133 (4th Cir. 2023) (quoting 20 U.S.C. § 1415(f)(3)(E)(i)).

5

After exhausting the state procedures, the IDEA permits any aggrieved party to file a civil suit in federal court. 20 U.S.C. § 1415(i)(2)(A). This is not an appeal of the state administrative decision, but "an original civil action." *Johnson v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 20 F.4th 835, 844 (4th Cir. 2021).

## II.   Factual Background

This Court affords "due weight" to the state administrative proceedings that preceded this action. *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (internal quotation marks omitted). To afford "due weight," a court considers an Administrative Law Judge's factual findings and credibility determinations as *prima facie* correct so long as those findings were "'regularly made.'" *G.M.*, 114 F.4th at 334 (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)). For the reasons set forth more fully below,[2] this Court accepts ALJ Andrews's factual findings and credibility determinations as true. *See C.E. v. Montgomery Cnty. Pub. Schs.*, ABA-24-1941, 2026 WL 828821, *2 (D. Md. Mar. 26, 2026) (accepting the ALJ's statement of facts as true and using those facts in its own opinion); *A.J.V. ex rel. E.V. v. Carroll Cnty. Bd. of Educ.*, JRR-24-2543, 2025 WL 2695710, at *1 n.1 (D. Md. Sep. 22, 2025) (same). The facts in this Memorandum Opinion therefore largely mirror those in ALJ Andrews's Decision.

### a.  A.A.'s Medical History

A.A. was born in 2013 and is currently twelve years old. (ECF No. 7[3] (ALJ Decision ¶ 1).) He has been diagnosed with several medical conditions, including, among others,

---

[2] *See infra* Analysis, § I.

[3] All citations to the administrative record in this case are contained at ECF No. 7. The administrative record does not have sequential pagination and so the Court cites, as necessary, to individual documents within the record. Hereinafter, ALJ Andrews's decision will be cited as "ALJ Decision __."

hydrocephalus, epilepsy, L1 syndrome, gastrointestinal issues, and cerebral palsy. The Court attempts to describe A.A.'s medical history as it relates to these individual conditions. At the outset, and for the purposes of clarity, the Court notes that A.A. received his various diagnoses occurred over a significant period of time, from at least 2014 to November 2019. While the Court attempts to detail this medical history chronologically, it must, at times, present certain facts out of order.

A.A. has been diagnosed with hydrocephalus, a condition in which cerebrospinal fluid builds up within the brain.[4] (*Id.* ¶ 4 n.20); *Hydrocephalus*, Nat'l Inst. of Neurological Disorders & Stroke, https://www.ninds.nih.gov/health-information/disorders/hydrocephalus (last accessed May 26, 2026). To treat that condition, A.A. underwent surgery in 2014, when he was approximately one year old, to have a cerebrospinal fluid shunt implanted. (*Id.* ¶ 4.) A cerebrospinal fluid shunt—also called a brain shunt—is a medical device that diverts excess fluid from the brain to the chest or abdominal cavity to reduce pressure in the brain. *Cerebral Spinal Fluid (CSF) Shunt Systems*, U.S. Food & Drug Admin., https://www.fda.gov/medical-devices/implants-and-prosthetics/cerebral-spinal-fluid-csf-shunt-systems (last accessed May 26, 2026). From 2014 to 2019, he underwent twelve more surgeries to replace and revise his shunt. (*Id.* ¶¶ 4–5.) His most recent shunt surgery, his thirteenth overall, was on February 28, 2019. (*Id.*)

A.A. also has epilepsy. (*Id.* ¶ 2.) He was diagnosed with that condition, which includes tonic-clonic, absence, and focal seizures, in March 2016. (*Id.*) As relevant here, tonic-clonic

---

[4] It is not clear from the record when A.A. was diagnosed with hydrocephalus. Given that he born in 2013 and first implanted with a shunt in 2014 (ALJ Decision ¶ 4), it stands to reason that he was diagnosed with hydrocephalus within the first year of his life.

seizures, formerly referred to as grand mal seizures, involve two separate phases. *See Tonic-Clonic Seizures*, Epilepsy Found., https://www.epilepsy.com/what-is-epilepsy/seizure-types/tonic-clonic-seizures (last accessed May 26, 2026). The first phase, the tonic phase, entails a stiffening of the body, while the subsequent clonic phase involves muscle contractions across the body. *Id.* ALJ Andrews determined that A.A. had only had a "hand full [sic]"[5] of tonic-clonic seizures during his life, and that each was associated with some form of head trauma, surgery, or shunt malfunction. (*Id.* ¶ 9.) A.A. has not suffered a tonic-clonic seizure since December 2020. (*Id.*)

Additionally, A.A. was born with a mutation of his L1CAM gene. (*Id.* ¶ 3.) This mutation was diagnosed in June 2016, three months after his epilepsy diagnosis. (*Id.*) Ultimately, more than three years later, in November 2019, A.A. was diagnosed with L1 syndrome. (*Id.*) Plaintiffs contend in their Motion for Summary Judgment that L1 syndrome carries with it a "host of medical complications." (ECF No. 15-1 at 5.) Indeed, they contend that many, if not all, of A.A.'s diagnoses stem from the mutation of his L1CAM gene. (*Id.*) As they further note, much remains unknown about the mutation of this gene and the related syndrome.[6] (*Id.*)

A.A. also experiences gastrointestinal issues. (ALJ Decision ¶¶ 5–6.) From 2017 to 2019, he was hospitalized ten separate times related to gastrointestinal issues and to monitor for epileptic seizures. (*Id.* ¶ 6.) At some point in 2019,[7] A.A. underwent a fourteenth surgery,

---

[5] The specific number of tonic-clonic seizures that A.A. has experienced is not in ALJ Andrews' findings of fact.

[6] L1 syndrome is, more accurately, a group of related disorders, all of which stem from a variation in the L1CAM gene. It appears that the mutation presents more severely in males and often carries with it multiple medical complications, including, but not limited to, hydrocephalus, adducted thumbs, and intellectual disability. *See* Connie Stumpel, MD, PhD, & Yvonne J. Vos, PhD, *L1 Syndrome*, *in GeneReviews* (Adam MP et al. eds., 2021).

[7] The specific date of A.A.'s fourteenth surgery is not clear from the record.

specifically a percutaneous endoscopic gastrostomy ("PEG"). (*Id.* ¶ 5.) A PEG is a minimally invasive procedure in which doctors place a feeding tube directly into the patient's stomach through the abdominal wall.[8] A.A.'s attempted PEG was not successful. (*Id.*) On January 13, 2020, he had a fifteenth surgery, during which he was implanted with a gastrostomy tube for feeding and a cecostomy tube for bowel movement. (*Id.* ¶ 7.) He was also hospitalized seven separate times in 2020 for gastrointestinal issues as well as to monitor his hydrocephalus and epilepsy. (*Id.* ¶ 8.) On February 6, 2023, A.A. had his sixteenth overall surgery, during which doctors debrided his cecostomy tube.[9] (*Id.* ¶ 10.) He has not had another surgery since. (*Id.*)

A.A. has received several other diagnoses, including: cerebral palsy; subluxation of hip; visual impairment; optic atrophy; asthma; attention and concentration deficit; and disruptive behavior. (*Id.* ¶¶ 11, 27.) He uses a wheelchair and other mobility devices for transportation. *See* (*id.* ¶¶ 63, 74); *see also* (ECF No. 7 (Tr. of Admin. Hr'g at 71, 196[10])). He speaks on his own but also uses an assistive technology device to communicate. (Tr. at 71.) As related to his gastrointestinal issues, he eats by mouth but also receives further nutrition, hydration, and his medicine through his gastrostomy tube. (Tr. at 179, 211, 494–96, 676.) He also wears a diaper. (ALJ Decision ¶¶ 63, 74.)

### b. A.A.'s Educational History

#### i. Anne Arundel County Public Schools History

---

[8] *See generally* Margaret Wei et al., *An Overview of Percutaneous Endoscopic Gastrostomy Tube Placement in the Intensive Care Unit*, 13 J. Thoracic Disease 5277 (2021).

[9] Debridement refers to the surgical removal of lacerated, devitalized, or contaminated tissue from the body. *See* (ALJ Decision at 7 n.23 (quoting *Debridement*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/debridement)).

[10] Hereinafter, the transcript of the administrative hearing before ALJ Andrews will be cited as "Tr. at __."

In 2019, A.A. moved with his family to Maryland. (*Id.* ¶ 12.) His parents enrolled him in Anne Arundel County Public Schools ("AACPS") for his kindergarten year (that is, the 2019–2020 school year). (*Id.*) While a student of AACPS, he received special education services pursuant to an IEP. (*Id.* ¶ 13.) During his kindergarten year, A.A. did not have a Private Duty Nurse ("PDN") with him at school. (Tr. at 734.) For his first-grade year (the 2020–2021 school year), his parents entered a PDN Letter of Agreement with AACPS. (ALJ Decision ¶ 14.) The Letter of Agreement detailed that the PDN would attend school with A.A. and would exclusively provide for his daily medical care, including emergency procedures related to seizures and other medical conditions. (*Id.* ¶¶ 16–18.) The Letter dictated that A.A.'s parents would provide the Private Duty Nurse. (*Id.* ¶ 17.) It further dictated that the AACPS school nurse would be familiar with A.A.'s conditions and medical care to assist in emergencies or a momentary absence of his PDN. (*Id.* ¶ 16.) Beyond that, AACPS "assumed no special liability for [A.A.] other than its responsibility to all students in the event of an emergency." (*Id.*) Throughout his entire time as a student of the Anne Arundel County Public Schools, the school system maintained that a PDN was not necessary. (ECF No. 20-1 at 6.)

From 2020 to November 2022, A.A.'s Private Duty Nurse was provided pursuant to his father's military health insurance. (ALJ Decision ¶ 19.) In November 2022, during his third-grade school year, A.A.'s father retired from the military. (*Id.* ¶ 20.) His parents then enrolled him in Maryland's Medicaid Model Waiver program (the "Model Waiver program") to obtain ongoing PDN services.[11] (*Id.*)

---

[11] The Model Waiver program helps medically fragile children under the age of twenty-two live at home when, without such benefit, they would require hospitalization due to the complexity of their care. (*Id.* ¶ 23); *Model Waiver*, Md. Dep't of Health – Medicaid, https://health.maryland.gov/mmcp/ltss/Pages/model-waiver.aspx (last accessed May 26, 2026).

The next month, December 2022, A.A.'s PDN was precluded from his school by the Anne Arundel County Public Schools. (Tr. at 458–60.) Around the same time, his parents sought and received an exemption for A.A. to receive his education through a Home and Hospital program. (ALJ Decision ¶ 21); (Tr. at 458–60). In such a program, "public school students who are unable to participate in their school of enrollment due to a physical or emotional condition" can receive educational services at their home or in a hospital. Md. Code Regs. 13A.03.05.01A. During this time, A.A. remained enrolled as a student in the Anne Arundel County Public Schools, but received education at his home with access to his Private Duty Nurse. (*Id.*)

On January 17, 2023, he began receiving nursing services through the Model Waiver program. (*Id.* ¶ 22.) His pediatrician, Naomi Rios, MD, certified his eligibility for the program and established his plan of care. (*Id.*) The Model Waiver program required Dr. Rios to re-certify A.A.'s eligibility for nursing services every ninety days. (*Id.* ¶ 22.) With respect to his plan of care, A.A.'s plan of care authorized fifty hours per week of skill nursing by a registered nurse or licensed practical nurse. (*Id.* ¶ 25.) The plan of care identified A.A.'s principal diagnoses as L1 syndrome, hydrocephalus with a cerebrospinal fluid shunt, and cerebral palsy developmental delay. (*Id.*)

On May 11, 2023, AACPS's nurse stated that A.A.'s health needs at his school had been assessed multiple times and that he could attend school safely without a PDN. (ECF No. 7 (HCPS Exs. 42.11, 43.7).) In a note from Dr. Rios dated August 22, 2023, she stated that A.A. was "doing well at th[at] time" with respect to epilepsy, asthma, and feeding by gastrostomy tube. (ECF No. 7 (Ps. Ex. 14-0010).)

On September 11, 2023, A.A.'s parents notified Patricia Gunshore of the Howard County Public Schools ("HCPS") that the family would be moving to Howard County, Maryland. (*Id.* ¶ 33.) His parents informed Ms. Gunshore that A.A. would need to be enrolled into the HCPS system as a medically fragile student. (*Id.*) A.A.'s parents withdrew him from the AACPS system on October 6, 2023. (*Id.* ¶ 34.)

Around this same time, on September 22, 2023, Dr. Rios re-certified A.A. as eligible under the Model Waiver program to receive PDN services from October 20, 2023, to January 20, 2024. (*Id.* ¶ 24.)

### ii.   Howard County Public Schools History

After his family moved to Howard County in September 2023, A.A. was enrolled in the Howard County Public Schools system on October 13, 2023. (*Id.* ¶ 35.) Specifically, he was enrolled as a fourth grader at Pointers Run Elementary School. (*Id.* ¶ 47.) Pointers Run is an elementary school with approximately 850 students. (*Id.* ¶ 48.) It also has several regional programs for students with special education needs. (*Id.*) In October 2023, the fourth grade at Pointers Run had approximately 126 students, with approximately twenty-seven students in A.A.'s classroom. (*Id.* ¶ 49.) The Pointers Run Health Room was staffed by two nurses, including school nurse Robin Schwartz, BSN, RN. (*Id.* ¶ 50.)

HCPS determined that A.A. had an educational disability and was eligible for special education services under the IDEA. (ECF No. 20-1 at 2.) On November 17, 2023, HCPS convened an IEP meeting, referred to as a "move-in review," to assess his records, determine his eligibility for special education, consider comparable services, and to determine if new assessments needed to be conducted. (*Id.* ¶ 51.) A.A.'s IEP Team included his mother, who is

a registered nurse (*id.* at 4 n.7); Annie McLaughlin, PhD, a special consultant for his parents; Robin Schwartz, the Pointers Run school nurse; Lee Ann Pazulski, the Health Services Supervisor for HCPS; Patricia Gunshore, the Special Education Coordinator for HCPS; and Maria Carr, an Assistant Principal at Pointers Run. (*Id.* ¶ 52.)

The IEP Team discussed A.A.'s needs. (*Id.* ¶ 53.) His mother shared information about his medical fragility, including his use of a gastrostomy tube, his shunt, and that he takes medication at school. (*Id.* ¶ 54.) She stated that each of A.A.'s medical needs could be managed, but that she remained concerned about what might happen if he experienced several issues at once. (*Id.*) She requested that HCPS provide a Private Duty Nurse for her son as part of his IEP. (*Id.*)

Ms. Pazulski, an employee of HCPS, explained the school system's eligibility criteria for a Private Duty Nurse. (*Id.* ¶¶ 56–57.) In relevant part, an HCPS student qualifies for a PDN if he is "medically unstable" and has medical conditions that "can rapidly change resulting in sudden decline requiring medical intervention." (*Id.* ¶ 58.) A student may also qualify if he has a "complex, active seizure disorder[] requiring either pulse ox[ygen] monitoring with application of oxygen or the immediate administration of . . . emergency seizure medication." (*Id.*) Conversely, a student within the Howard County Public Schools does not qualify for a PDN if he has "stable medical conditions . . . or needs only physical or occupational therapy." (*Id.* ¶ 59.) If HCPS determines that a student requires close adult supervision, it assigns a staff member who is not a nurse to be with the student in a one-on-one setting. (*Id.*) At the close of the November 17, 2023, meeting, Ms. Gunshore informed

13

A.A.'s parents that their concerns could be revisited after Ms. Schwartz had developed a healthcare plan. (*Id.* ¶ 60.)

On December 5, 2023, Dr. Rios informed HCPS that A.A.'s health is "tenuously balanced" and that he had previously experienced "rapid decline, severe complications, and prolonged hospitalizations following shunt malfunctions and seizures." (*Id.* ¶ 61.) She recommended that all classroom and nursing staff be trained to identify and respond to seizure symptoms, with a nurse on campus throughout each school day. (*Id.* ¶ 62.) Among other further recommendations, she opined that it was "essential" for a nurse to administer seizure medication within five minutes of any large seizure. (*Id.*) Finally, she recommended that A.A. have a PDN. (*Id.* ¶ 63.)

On December 15, 2023, A.A.'s IEP Team convened again. (*Id.* ¶ 64.) The participants in that meeting largely matched those involved on November 17, with the notable addition of Laurie E. Scott, a nursing consultant for A.A.'s parents. (*Id.*) During the December 15 meeting, A.A.'s mother expressed concern that Pointers Run would not be able to meet A.A.'s medical needs and requested a PDN for her son. (*Id.* ¶ 65.) Ms. Scott stated that A.A. was at risk of medical emergency and possible death. (*Id.* ¶ 66.) She further stated that the school could not delegate his care to nurses or other staff because his needs "are not routine or predictable." (*Id.*) Ms. Schwartz stated that she had not yet met A.A. and would be conducting an evaluation of him. (*Id.* ¶ 67.)

During that meeting, A.A.'s IEP Team created his Individualized Education Plan. (*Id.* ¶ 68.) The IEP called for special education and related services and listed his primary disability as "multiple disabilities." (*Id.*) As relevant to this case, the IEP detailed that A.A. required

14

multiple related services. (*Id.*) Specifically, it stated that he "required a dedicated adult support for all functional tasks, mobility, transitioning to different classrooms, transitioning in and out of equipment, walking in assistive devices, and for self-care needs." (*Id.* ¶ 72 (quoting the IEP).) The dedicated adult support listed in the IEP would "help implement modifications to the general education curriculum and ensure that [A.A. could] access all curriculum and activities in the general education classroom, the school building, and to assist [him] during emergency evacuations." (*Id.* ¶ 73 (quoting the IEP).) Additionally, the IEP stated that A.A.'s dedicated adult support would help him to use his wheelchair, monitor his gastrostomy tube to reduce risk of skin breakdown and infection, change his diapers, implement his mealtime plan for safe eating, (*Id.* ¶¶ 74, 76–77.) HCPS named Tiara Jones as A.A.'s dedicated adult support. (*Id.* ¶ 78.)

On December 19, 2023, the IEP Team convened for a third IEP meeting. (*Id.* ¶ 79.) During that meeting, the Team decided that the least restrictive environment for A.A. to receive his special education services would be at Pointers Run. (*Id.* ¶ 80.) The Team also decided that A.A. would benefit from a slow transition back to school, beginning with a partial-day program, because of his complex medical needs and having received Home and Hospital instruction since approximately December 2022. (*Id.* ¶¶ 81–82.) Officials for HCPS stated that A.A. would need an assessment to determine whether he needed a Private Duty Nurse. (*Id.* ¶ 83.)

On December 20, 2023, Ms. Schwartz, the Pointers Run school nurse, assessed A.A. (*Id.* ¶ 84.) She concluded that he required: (1) the administration of medicine, including Adderall and possibly seizure medicine, during the day; (2) cleaning and flushing of his

gastrostomy tube and administration of medicine by the same; and (3) other special needs related to transportation, including a bus with a wheelchair lift. (*Id.* ¶ 87.) Ms. Schwartz determined that these tasks were delegable to an unlicensed individual. (*Id.*) Also during the assessment, A.A.'s mother disclosed that he had not had a seizure requiring medicine in multiple years, had not been hospitalized since February 2023, that his last shunt surgery was in February of 2019, and that he did not currently have a doctor's order for oxygen. (*Id.* ¶ 89.)

On approximately January 4, 2024, HCPS developed an Individualized Health Care Plan (the "Plan") for A.A. (*Id.* ¶ 91.) The Plan described his major diagnoses and medical issues, provided nursing goals for A.A. to enjoy a safe and nurturing school environment, and described emergency plans for shunt malfunction, seizures, and issues with his gastrostomy or cecostomy tubes. (*Id.* ¶¶ 91–94.) As relevant to the shunt, the Plan called for A.A. to be placed in an upright position, to notify the Pointers Run nurse, call the parents, possibly call for an ambulance, and notify administrators. (*Id.* ¶ 95.) With respect to seizures, the Plan required Pointers Run staff to: (1) start timing the seizure; (2) call the school nurses; (3) clear the area around A.A.; (4) complete a seizure checklist; (5) be prepared to administer cardiopulmonary resuscitation ("CPR"); (6) allow him to rest after a seizure; and (7) call his parents. (*Id.* ¶ 96.) For tonic-clonic seizures or a cluster of focal seizures lasting three minutes, the Plan called for the registered nurse on duty to give A.A. emergency seizure medicine. (*Id.*)

On January 5, 2024, the IEP Team convened a fourth time to discuss A.A.'s eligibility for a Private Duty Nurse. (*Id.* ¶ 97.) Ms. Schwartz reported that A.A. has a complex medical history but did not meet the criteria for a PDN. (*Id.* ¶ 98.) She further stated that if there were a change in his circumstances requiring a reevaluation, such reevaluation would be timely

addressed. (*Id.*) The IEP Team also discussed training for staff and service providers at Pointers Run. (*Id.* ¶ 99.) By January 8, 2024, Pointers Run had acquired all necessary equipment for A.A. to attend school there. (*Id.* ¶ 100.) On January 9, 2024, the school conducted its first training. (*Id.* ¶ 103.) The training was run by the school's physical therapist and trained all staff who would have contact with A.A. on how to transfer him, including for the purpose of changing his diaper. (*Id.*) ALJ Andrews found that after this training, "because staff at [Pointers Run] would be capable of providing for [A.A.]'s most immediate needs and safety," the school would be ready for A.A. to begin attending. (*Id.* ¶ 104.) A.A. and his mother attended the January 9, 2024, training. (*Id* ¶ 105.) After that training, however, his mother refused to bring him to school without a PDN. (*Id.*)

### III.   Procedural History

On February 27, 2024, A.A.'s parents filed a due process complaint in the Maryland Office of Administrative Hearings. (*Id.* at 1.) Administrative Law Judge Daniel Andrews held a ten-day administrative hearing on June 18, 21, 23, and 25; July 9, 23, 25, and 30; and August 5 and 22, 2024. (*Id.* at 3.) Four experts testified on behalf of HCPS, while three witnesses testified for A.A.'s parents. (*Id.* at 4, 5.) ALJ Andrews issued his forty-one-page decision on September 20, 2024, in which he found that HCPS had offered A.A. a Free Appropriate Public Education satisfying the IDEA. (*Id.* at 41.) Specifically, he "conclude[d] as a matter of law that [HCPS] provided [A.A.] with an IEP that was reasonabl[y] calculated to provide [him] with a FAPE because he can safely attend school without a PDN." (*Id.* (citing, as relevant, *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dis. RE-1*, 580 U.S. 386 (2017); *Cedar Rapids Cnty. Sch. Dist. v. Garret F.*, 526 U.S. 663 (1999); 20 U.S.C. § 1401).) He further concluded that A.A. was not

entitled to any additional compensatory education beyond that which was agreed upon by the parties. (*Id.*) In sum, he denied the parents' due process complaint.

Four months later, on January 16, 2025, Plaintiffs A.A. and his parents B.A. and K.A., in their own right and on behalf of their son, filed this three-count Complaint for Declaratory and Injunctive Relief against Defendants William J. Barnes, in his official capacity as Superintendent of Howard County Public Schools, and the Howard County Board of Education. (ECF No. 1.) In essence, Plaintiffs allege that HCPS failed to afford A.A. with a Free Appropriate Public Education and thus violated the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (*Id.*) (*Id.*) In Count I, they allege a failure on the part of Defendants to provide A.A. with a Free Appropriate Public Education. (*Id.*) In Count II, they allege that the ALJ Andrews failed by not ordering Defendants to provide A.A. with a Private Duty Nurse. (*Id.*) Finally, in Count III, Plaintiffs allege that the ALJ committed error and violated their due process rights under the IDEA and Maryland law by failing to render a proper decision based on an accurate and impartial understanding of the facts. (*Id.*) As this Court has already stated, the core of the Plaintiffs' claims is that Defendants should have provided A.A. with a Private Duty Nurse during the 2023–2024 school year.

Plaintiffs filed a Motion for Summary Judgment on September 5, 2025. (ECF No. 15.) Defendants filed a Response in Opposition and Cross-Motion for Summary Judgment on November 18, 2025. (ECF No. 20.) This matter is ripe for review.

**STANDARD OF REVIEW**

As Judge Rubin of this Court has previously noted, "'[a]n action filed in federal district court pursuant to the IDEA is an original civil action, not an appeal from a state administrative

agency.'" *A.J.V. ex rel. E.V. v. Carroll Cnty. Bd. of Educ.*, JRR-24-2543, 2025 WL 2695710, at \*9 n.1 (D. Md. Sep. 22, 2025) (quoting *Charlotte-Mecklenburg Cnty. Bd. of Educ. v. Brady*, 66 F.4th 205, 211 (4th Cir. 2023)). The court "cannot affirm, reverse, vacate, or remand the state hearing officer's decision." *G.M.*, 114 F.4th at 330 (citing *Johnson*, 20 F.4th at 845–46). A federal court "conducts an independent review, deferring to the hearing officer's 'regularly made' factual findings and ordering substantive or procedural relief as necessary." *Id.* (quoting *Doyle*, 953 F.2d at 105). A court is obliged to give "due weight" to the underlying state administrative proceedings.

"Due weight" means that the administrative law judge's factual findings "must 'be considered prima facie correct'" so long as they are "regularly made." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008). An assessment of whether findings were regularly made "focuses on the '*process* through which the findings were made,' not the results of that process." *G.M.*, 114 F.4th at 334 (4th Cir. 2024) (quoting *Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023)). The procedure is acceptable, and the factual findings are entitled to deference, when the ALJ "employs a process that is not 'far from the accepted norm of a fact-finding process.'" *Id.* (quoting *J.P.*, 516 F.3d at 259). Additionally, "[t]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004) (quotation omitted).

As Judge Abelson of this Court has recently noted, "[p]laintiffs in IDEA cases 'carry the burden of proof' by a preponderance of the evidence." *C.E. v. Montgomery Cnty. Pub. Schs.*, ABA-24-1941, 2026 WL 828821, \*6 (D. Md. Mar. 26, 2026) (quoting *S.A. v. Weast*, 898 F.

19

Supp. 869, 874 (D. Md. 2012)). "When assessing whether that burden has been met, [courts] are not entitled to 'substitute [their] own notions of sound educational policy for those of local school authorities.'" *G.M. ex rel. E.P. v. Barnes*, 114 F.4th 323, 342 (4th Cir. 2024) (quoting *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997)). The IDEA "requires great deference to the views of the school system rather than [to] those of even the most well-meaning parent. *Id.* (quoting *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004)) (alteration in original).

As Judges Rubin and Abelson of this Court have recently noted in *A.J.V. ex rel. E.V. v. Carroll County Board of Education* and *C.E. v. Montgomery County Public Schools*, respectively, in an IDEA case involving cross-motions for summary judgment, the Court examines each motion separately, employing the basic standard of review under Rule 56 of the Federal Rules of Civil Procedure. *See A.J.V.*, 2025 WL 2695710, at *10 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)); *C.E.*, 2026 WL 828821, at *6 (quoting *Simply Wireless Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 277 (4th Cir. 2024)).

## ANALYSIS

Plaintiffs contend that Howard County Public Schools failed to offer A.A. a Free Appropriate Public Education for the 2023–2024 school year. (ECF No. 15.) As previously noted, this allegation centers on HCPS's decision to create an IEP that did not provide him with a Private Duty Nurse. (*Id.*) They also seek compensatory educational services for the time that A.A. was not provided with a PDN. (*Id.*)

### I. ALJ Andrews's Factual Findings are Entitled to Due Weight

The Court affords "due weight" to the state administrative proceedings that preceded this action. *MM*, 303 F.3d at 530–31 (internal quotation marks omitted). To afford "due weight," a court considers an Administrative Law Judge's factual findings and credibility determinations as *prima facie* correct so long as those findings were "'regularly made.'" *G.M.*, 114 F.4th at 334 (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)). Whether factual findings were regularly made is determined by looking at the "'*process* through which the findings were made,' not the results of that process." *G.M.*, 114 F.4th at 334 (quoting *Bouabid*, 62 F.4th at 857) (emphasis in original). Findings are regularly made if the hearing officer "conducted a proper hearing, allowing the parents and the [school] to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in a normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P.*, 516 F.3d at 259. If the hearing officer follows a process "that is not 'far from the accepted norm of a fact-finding process,'" then the federal court may "rely on [his] findings when making [its] independent decision based on a preponderance of the evidence." *G.M.*, 114 F.4th at 334 (first quoting *J.P.*, 516 F.3d at 259; then quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). If a court departs from a hearing officer's findings, it must "explain why." *Doyle*, 953 F.2d at 105.

In this case, ALJ Andrews conducted a ten-day hearing during which both sides put on evidence and witnesses and advanced detailed arguments. ALJ Andrews then issued a thorough forty-one-page opinion, including 107 findings of fact, legal analysis, and conclusions of law. This Court therefore considers his factual findings *prima facie* correct in reviewing these Cross-Motions for Summary Judgment (ECF Nos. 15, 20).

Furthermore, as Judge Rubin of this Court recently noted in *A.J.V.*, the IDEA requires federal courts to pay "'great deference to the views of the school system rather than those of even the most well-meaning parent.'" *A.J.V.*, 2025 WL 2695710, at \*11 (quoting *G.M.*, 114 F.4th at 334)). The Supreme Court has likewise made clear that an IDEA challenge in federal court is not "not an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403–04 (2017) (internal citation and quotation omitted); *accord A.J.V.*, 2025 WL 2695710, at \*11 (quoting *Endrew F.*).

## II.    Defendants Did Not Deny A.A. a FAPE

Having determined that ALJ Andrews's decision is entitled to deference, *see Doyle*, 953 F.2d at 105, the Court independently assesses A.A.'s IEP, paying particular attention to HCPS's decision not to provide A.A. with a Private Duty Nurse. The Court's role is to determine whether Defendants failed to offer A.A. a FAPE through his Individualized Education Plan. In fulfilling this role, the Court owes deference not only to the factual findings of the ALJ, but also to his determinations as to the credibility of witnesses. *G.M.*, 114 F.4th at 334 (quoting *Doyle*, 953 F.2d at 105).

The IDEA entitles qualifying students to a Free Appropriate Public Education, which includes a "special education and related services." 20 U.S.C. § 1412(a)(1)(A); *id.* § 1401(3)(A), (9). The IDEA defines "related services" to mean "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." *Id.* § 1401(26)(A). In turn, and as relevant to

A.A., the IDEA's implementing regulations define "other supportive services" as including "school health services and school nurse services . . . designed to enable a child with a disability to receive [a FAPE]." 34 C.F.R. § 300.34(c)(13). "School nurse services are services provided by a qualified school nurse." *Id.* "School health services are services that may be provided by either a qualified school nurse or other qualified person." *Id.*

These related services must be provided in the context of an Individualized Education Plan. The Supreme Court has repeatedly stated that a school must offer a disabled student an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 US. at 399. "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* (quoting *Rowley*, 458 U.S. at 206–07) (emphasis in original).

Plaintiffs argue, as they did at the administrative hearing, that A.A.'s IEP needed to provide him, as IDEA "related services," with a Private Duty Nurse. (ECF No. 15-1 at 16.) They offer several separate rationales to support this overarching argument. First, they argue, as a matter of fact, that Ms. Schwartz, the school nurse for Pointers Run, agreed with the parents that A.A. needed a PDN. (*Id.* at 16–17, 19.) Second, as a legal matter, they argue that HCPS's decision not to provide A.A. with a Private Duty Nurse contravened Maryland's Nursing Practice Act because that law required the school system to defer to Nurse Schwartz.

(*Id.* at 17.) Finally, they argue that the health care services to be rendered to A.A. were not delegable to unlicensed staff. The Court addresses each argument in turn.

Ms. Robin Schwartz is a registered nurse and the school nurse at Pointers Run Elementary School. (ALJ Decision at 4.) Plaintiffs contend that she told A.A.'s mother verbally and in writing that he required a PDN. (ECF No. 15-1 at 19.) They point to an email from Ms. Schwartz to A.A.'s mother on December 5, 2023. In that email, Ms. Schwartz stated that A.A. "doesn't meet the criteria for a PDN and there is no plan for a 1:1 [nurse] that I am aware of." (*Id.* (citing Ps. Ex. 40-25).) She continued, "I am hoping that when everyone involved actually sees A.A.'s needs at school they will understand he needs a PDN." (*Id.*) She further noted that while A.A. did not meet the PDN eligibility criteria, she thought him to be "an exception." (*Id.*)

Plaintiffs' reliance on this and related putative communications between Ms. Schwartz and A.A.'s mother is misplaced for at least two reasons. First, Plaintiffs selectively draw meaning from those communications, placing significant weight on Ms. Schwartz's statements as to her alleged beliefs about A.A. while ignoring her clear statements that he did not meet the HCPS criteria for a PDN. At this stage, Plaintiffs must prove by a preponderance of the evidence that the decision not to provide a Private Duty Nurse denied A.A. a FAPE. *S.A.*, 898 F. Supp. at 874. Such clear statements by the Pointers Run nurse that he did not meet the eligibility criteria do not come close to meeting that evidentiary burden.

Second, ALJ did not include these communications as findings of fact in his decision, despite having been presented with them at the hearing and writing a thorough factual description of this case. He did, however, include numerous findings regarding Ms. Schwartz.

24

The most relevant of those is that ALJ Andrews found by a preponderance of the evidence that Ms. Schwartz performed a Special Health Needs Nursing Assessment of A.A. on December 20, 2023. (ALJ Decision ¶ 84.) Based on that assessment, she determined that A.A. required significant health support during school but that "the nursing services required . . . were delegable to an unlicensed individual." (*Id.* ¶ 87.)

In its current posture, the Court undertakes an independent assessment of the record but affords "due weight" to the factual findings and credibility determinations of the ALJ, which means treating those findings as *prima facie* correct. *G.M.*, 114 F.4th at 334 (citation omitted). As already explained, this includes treating the ALJ's factual findings as *prima facie* correct. *Id.* As the decision-maker closest to the facts and who has the advantage of receiving all exhibits and hearing all witnesses, the ALJ's findings as to Ms. Schwartz are owed significant deference.

Plaintiffs also note that Ms. Schwartz testified during the administrative hearing. (ECF No. 15-1 at 21.) They aver that she testified that her communications to A.A.'s mother, including her putative emails stating that she believed A.A. to need a PDN, were merely an attempt "to give A.A.'s mom some hope following the assessment and initial decision to deny the request" for a PDN. (*Id.*) Plaintiffs argue that this was a change in story by Ms. Schwartz forced upon her by her supervisors. (*Id.*) Again, it appears that ALJ Andrews was presented with all of this testimony and evidence during the ten-day hearing in 2024. His credibility determinations—including his decision *not* to find that Ms. Schwartz had changed her opinion because of supervisory pressure—are entitled to due weight. Moreover, ALJ Andrews devoted nearly five pages of his decision discussing two HCPS witnesses, Katie Wagaman, the Director

of School Health Services for HCPS, and Lee Ann Pazulski, the HCPS Health Services Supervisor, who testified regarding their determination that A.A. did not meet the criteria for a PDN. (ALJ Decision at 33–38.) ALJ Andrews found those witnesses credible and relied on their testimony in making his findings of fact. Plaintiffs argument, that Ms. Schwartz agreed with A.A.'s parents that he needed an IEP, fails to meet the preponderance of the evidence standard to show that HCPS denied A.A. a FAPE.

Plaintiffs' second argument for summary judgment is that HCPS's decision not to provide A.A. with a Private Duty Nurse violated Maryland's Nursing Practice Act, Md. Code Reg. 10.27.11.03C, because that law required the school system to defer to Nurse Schwartz. (ECF No. 15-1 at 19.) This argument fails for the simple reason that Plaintiffs cite no legal authority supporting their proposition that a school district must defer to a nurse when making determinations as to the health services to be provided to a student. Moreover, as a predicate matter, this argument incorrectly presupposes that Ms. Schwartz *actually* thought that A.A. needed a PDN and that her supervisors *forced* her to change her opinion. As previously discussed, Plaintiffs have not shown either of those factual claims by a preponderance of the evidence. Accordingly, Plaintiffs are not entitled to summary judgment on this argument.

Plaintiffs' third and final argument for summary judgment—and their core legal argument in this case—is that Maryland law did not permit A.A.'s nursing care to be delegated to an unlicensed individual. (ECF No. 15-1 at 23.) They argue that his care must have been provided by a registered nurse, specifically a PDN. (*Id.*) There is no legal authority cited for this proposition. This same argument was presented to ALJ Andrews, who found it "unpersuasive." (ALJ Decision at 37.) Specifically, ALJ Andrews found credible the HCPS

witnesses who stated that since A.A. "has not required any emergency medicine for years, his seizure disorder is stable." (*Id.*) He further stated that he found "no credible evidence to demonstrate that" A.A.'s gastrostomy tube and cecostomy tube were so complicated or atypical as to require the full-time assistance of a Private Duty Nurse. (*Id.*) ALJ Andrews found credible the testimony of Ms. Wagaman and Ms. Pazuslki, each of whom stated that HCPS staff have experience and training to care for with students with shunts, gastrostomy tubes, and seizures. (*Id.* at 37–38.) Ultimately, ALJ Andrews found that A.A.'s health needs were "chronic, stable, uncomplicated, routine, and predictable." (*Id.* at 38 (citing Md. Code Reg. 10.27.11.02F).)

This Court gives those findings, particularly ALJ Andrews's credibility determinations, their due weight. The Court also notes that, as a matter of law, the Maryland Department of Health and Maryland State Department of Education expressly permit health tasks to be delegated to unlicensed trained professionals. Those Departments have jointly issued a guidance manual titled "Delegations of Nursing Functions in a School Setting–Maryland State School Health Service Guidance." (ECF No. 7 (HCPS Ex. 40).) There is another manual relating to seizures: "Management of Students With Seizure–Maryland State School Health Service Guidelines." (*Id.* (HCPS Ex. 49).) Together, those manuals provide a broad range of health needs can be delegated to unlicensed trained professionals. Central to this case, the administration of CPR, First Aid, and emergency seizure medicine; monitoring for skin breakdowns, infections, and seizures; and ensuring that a student follows his oral feeding protocol are all delegable under Maryland guidelines. As applied to A.A., Ms. Wagaman and Ms. Pazulski explained that those Maryland guidelines provided that almost all of his care

needs could be delegated to an unlicensed trained professional. (Tr. at 1467, 1472, 1477–78.) They further testified that certain non-delegable tasks—including the administration of hydration and medicine through A.A.'s gastrostomy tube, notifying parents of a shunt failure, and performing assessment responses for baseline changes—would have been performed by the Pointers Run school nurse or nurse assistant. (*Id.* at 1437–38, 1471–72.)

Considering both the credibility determinations of ALJ Andrews and the Maryland standard for delegation of student health services, this Court finds that the IEP which HCPS developed for A.A. did not deny him a Free Appropriate Public Education. The record is abundantly clear that HCPS worked with A.A.'s mother and her consultants over the course of many IEP meetings, a nursing assessment, and a training session spanning from November 17, 2023, to January 8, 2024. Upon review of A.A.'s unique needs, the school determined that those needs, though significant, were not so complicated or unstable that he needed a Private Duty Nurse. Instead, HCPS created an IEP that envisioned a dedicated adult support, Ms. Tiara Jones, to be with A.A. at all times during the school day. Ms. Jones, though unlicensed, received training to take care of A.A. Additionally, the IEP provided that a nurse would provide A.A. with non-delegable care services and otherwise be present in the Pointers Run Health Room to assist if he experienced difficulties.

The Court concludes by reiterating that Plaintiffs bear the burden of showing, by a preponderance of the evidence, that this comprehensive care plan, integrated into A.A.'s IEP, amounted to a denial of a Free Appropriate Public Education that violated the IDEA. *S.A.*, 898 F. Supp. at 874. When assessing that burden, a federal court may not substitute its own "notions of sound educational policy for those of local school authorities." *Hartmann*, 118 F.3d

at 999. Rather, the IDEA requires "great deference to the views of the school system." *A.B.*, 354 F.3d at 328. Taking all this into account, Defendants did not deny A.A. a Free Appropriate Public Education when they decided not to provide him with a Private Duty Nurse for the 2023–2024 school year.

<h3 align="center">CONCLUSION</h3>

For the reasons stated above, Plaintiffs' Motion for Summary Judgment (ECF No. 15) is DENIED and Defendants' Cross-Motion for Summary Judgment (ECF No. 20) is GRANTED. Judgment shall be entered for Defendants William J. Barnes and Howard County Department of Education.

A separate Order follows.

Date: June 2, 2026
            /s/ _____
            Richard D. Bennett
            United States Senior District Judge